IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

_____

JASON CORLEY and ZACHARY LONG,

      Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.*,

      Defendants.

Civil Action No. 5:25-CV-00086-H

---

**DEFENDANTS' BRIEF IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

Saurabh Sharad
Assistant United States Attorney
New York Bar No. 5363825
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
saurabh.sharad@usdoj.gov

*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    I.   Statutory Background ............................................................................................ 2

    II.  FinCEN's Regulation of Real Estate Transactions ........................................ 3

        A.   FinCEN's Use of Geographic Targeting Orders ................................ 3

        B.   FinCEN's Final Rule ............................................................................ 5

    III. Procedural History ............................................................................................ 6

LEGAL STANDARD ........................................................................................................ 7

ARGUMENT .................................................................................................................... 7

    I.   The Rule falls within Congress's enumerated powers .................................... 8

        A.   Congress has expansive authority to enact economic regulations. ..................... 8

        B.   The Rule regulates economic activity well within the Commerce Clause. ....... 10

        C.   The *Lopez/Morrison* factors confirm the Rule's constitutionality.................... 16

        D.   The Rule is necessary and proper to effectuate the government's other powers... .................................................................................................................. 20

    II.  Vacatur of the Rule in its entirety is not warranted. ................................... 22

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Ainsworth v. Moffett Eng'g, Ltd.*,
  716 F.3d 174 (5th Cir. 2013) ................................................................ 19

*Am. Stewards of Liberty v. Dep't of the Interior*,
  370 F. Supp. 3d 711 (W.D. Tex. 2019) ................................................ 19

*Bondi v. VanDerStok*,
  145 S.Ct. 857 (2025) .............................................................................. 8

*Boyle v. Bessent*,
  2025 WL 509519 (D. Me. Feb. 14, 2025) ............................................ 13

*Cal. Bankers Ass'n v. Shultz*,
  416 U.S. 21 (1974) ............................................................................... 20

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) (en banc) ................................................ 22

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) ................................................................................. 8

*Cmty. Ass'ns Inst. v. Yellen*,
  2024 WL 4571412 (E.D. Va. Oct. 24, 2024) ...................................... 13

*Crawford v. Marion Cnty. Elec. Bd.*,
  472 F.3d 949 (7th Cir. 2007) ............................................................... 23

*Corner Post, Inc. v. Board of Governors*,
  603 U.S. 799 (2024) ............................................................................. 23

*Data Mktg. P'ship LP v. U.S. Dep't of Labor*,
  45 F.4th 846, 851 (5th Cir. 2022) ........................................................ 22

*Firestone v. Yellen*,
  2024 WL 4250192 (D. Or. Sept. 20, 2024) ........................................ 13

*GDF Realty Invs. Ltd. v. Norton*,
  326 F.3d 622 (5th Cir. 2003) ........................................................ *passim*

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat) 1 (1824) ................................................................. 10

*Gonzales v. Raich*,
  545 U.S. 1 (2005) .......................................................................... *passim*

*Groome Res. Ltd., L.L.C. v. Par. of Jefferson*,
    234 F.3d 192 (5th Cir. 2000) .......................................................................... *passim*

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981) ........................................................................................ 16

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ..................................................................................... 21, 22

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
    502 U.S. 183 (1991) .......................................................................................... 8

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963) ........................................................................................ 21

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
    334 U.S. 219 (1948) .......................................................................................... 9

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ....................................................................... 10

*McHenry v. Texas Top Cop Shop*,
    No. 24A653, 604 U.S. ---, 2025 WL 272062 (U.S. Jan. 23, 2025) ........................ 14

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .................................................................................... 8, 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................................... 9, 19

*NLRB v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937) ............................................................................................. 8

*Seniors Civil Liberties Ass'n Inc. v. Kemp*,
    965 F.2d 1030 (11th Cir. 1992) ...................................................................... 11

*Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*,
    395 F.3d 533 (5th Cir. 2004) ........................................................................... 7

*Smith v. U.S. Dep't of the Treasury*,
    761 F. Supp. 3d 952 (E.D. Tex. 2025)............................................................. 13

*Terkel v. Centers for Disease Control & Prevention*,
    521 F. Supp. 3d 662 (E.D. Tex. 2021)....................................................... 12, 13

*Texas v. United States*,
    126 F.4th 392 (5th Cir. 2025)..................................................................... 23, 24

*Trump v. CASA*,
    145 S.Ct. 2540 (2025) .................................................................................... 22

*Ullmann v. United States*,
    350 U.S. 422 (1956) ...................................................................................... 21

*United States v. Comstock*,
    560 U.S. 126 (2010) ................................................................................ 9, 10

*United States v. Goodwin*,
    141 F.3d 394 (2d Cir. 1997) ........................................................................ 14

*United States v. Ho*,
    311 F.3d 589 (5th Cir. 2002) ................................................... 17, 18, 19, 20

*United States v. Lopez*,
    514 U.S. 549 (1995) .................................................................................. 9, 18

*United States v. McClaren*,
    13 F.4th 386 (5th Cir. 2021) ........................................................................ 14

*United States v. Morrison*,
    529 U.S. 598 (2000) ...................................................................... 16, 17, 19

*United States v. Robinson*,
    119 F.3d 1205 (5th Cir. 1997) ............................................................... 17, 18

*United States v. Spann*,
    2012 WL 4341799 (N.D. Tex. Sept. 24, 2012) ........................................ 19

*United States v. Texas*,
    599 U.S. 670 (2023) .............................................................................. 22, 23

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*,
    751 F.2d 721 (5th Cir. 1985) ....................................................................... 23

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ....................................................................................... 8

*Whole Woman's Health v. Paxton*,
    972 F.3d 649 (5th Cir. 2020) ....................................................................... 19

*Wickard v. Filburn*,
    317 U.S. 111 (1942) ...................................................................................... 12

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ...................................................................................... 21

iv

**U.S. Constitution**

Art. I, § 8, cl. 3 ........................................................................................................ 8

Art. I, § 8, cl. 18 ...................................................................................................... 9

**Statutes**

5 U.S.C. § 702 ......................................................................................................... 7

5 U.S.C. § 706(2) ................................................................................................... 22

8 U.S.C. § 1324a .................................................................................................... 20

26 U.S.C. §§ 6012, 6031-60 .................................................................................. 20

52 U.S.C. § 30104 .................................................................................................. 20

Anti-Money Laundering Act of 2020,
  Pub. L. No. 116-283, 134 Stat. 3388 (2021) ................................................ *passim*

Bank Secrecy Act,
  12 U.S.C. §§ 1829b, 1951-60; 31 U.S.C. §§ 5311–14, 5316–36 ............................. 2

    31 U.S.C. § 5311 ........................................................................................ 18, 21

    31 U.S.C. § 5311(1) ......................................................................................... 16

    31 U.S.C. § 5312(a)(2)(U) .......................................................................... 1, 3, 5

    31 U.S.C. § 5312(g)(1) ....................................................................................... 5

    31 U.S.C. § 5318 ............................................................................................... 18

    31 U.S.C. § 5318(a)(2) ............................................................................... 3, 5, 16

    31 U.S.C. § 5318(g) ............................................................................................ 2

    31 U.S.C. § 5318(g)(1) ..................................................................................... 16

    31 U.S.C. § 5318(g)(5)(D)(i)(I) .......................................................................... 3

    31 U.S.C. § 5318(h)(1) ........................................................................................ 2

    31 U.S.C. § 5326 ................................................................................................. 4

Currency and Foreign Transactions Reporting Act of 1970,
  Pub. L. No. 91-508, 84 Stat. 1114 (1970) ........................................................... 2

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 7

Fed. R. Civ. P. 65 ..................................................................................................... 7

**Regulations**

*Anti-Money Laundering Regulations for Residential Real Estate Transfers*,
    89 Fed. Reg. 70,258 (Aug. 24, 2024) ............................................................... *passim*

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ................................................................ 10

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
    131 Harv. L. Rev. 417 (2017) ......................................................................... 22

**INTRODUCTION**

Under the Bank Secrecy Act (BSA), Congress authorized the Department of the Treasury to require financial institutions to report on transactions that are likely to be indicative of money laundering, terrorist financing, or other criminal activity. Congress expressly included "persons involved in real estate closings and settlements" within the class of financial institutions subject to the BSA. 31 U.S.C. § 5312(a)(2)(U). The Financial Crimes Enforcement Network (FinCEN), a Treasury bureau tasked with implementing and enforcing the BSA, determined that a subset of real estate transactions—those that transferred residential real property to certain legal entities and trusts without the involvement of banks or similarly regulated entities—posed a heightened risk for money laundering or other illicit financial activity. FinCEN accordingly exercised its authority under the BSA to issue a rule requiring certain persons involved in these transactions to submit a report identifying, among other things, the parties to the transaction and the property transferred. *See Anti-Money Laundering Regulations for Residential Real Estate Transfers*, 89 Fed. Reg. 70,258 (Aug. 24, 2024) (to be codified at 31 C.F.R. ch. X) (the Rule). After public notice and comment, FinCEN determined that these reports were needed to curtail the ability of malign actors to launder illicit proceeds through transfers of residential real property, thus safeguarding the nation's financial system and promoting national security.

Plaintiffs do not dispute that Congress may prohibit money laundering and other harmful economic activity. Nor do Plaintiffs challenge FinCEN's ability to require reporting on financial transactions under the BSA generally. Instead, Plaintiffs claim only that the requirement to report certain real estate transactions exceeds the limitations of the Commerce Clause, maintaining that the transfer of residential property is not an economic transaction at all. Plaintiffs' argument misapprehends the well-established reach of the Commerce Clause, overlooks the Rule's place within Congress's larger anti-money laundering scheme, and is foreclosed by binding precedent.

FinCEN's Rule regulates quintessential economic activity within the nation's large and economically significant housing market, well within the heartland of the government's commerce power. Beyond regulating commerce, the Rule is also necessary to effectuate other powers vested

1

in the federal government, including the foreign affairs and national security powers. The reporting requirement thus fits comfortably within the limits of the federal government's enumerated powers and Defendants are entitled to summary judgment.

## BACKGROUND

### I.    Statutory Background

Congress passed the BSA to combat money laundering, terrorist financing, and other illicit finance threats in the United States.[1] The BSA, as amended, requires certain reports and records from financial institutions that may be "highly useful" in "criminal, tax, or regulatory investigations, risk assessments, or proceedings; or intelligence or counterintelligence activities." 31 U.S.C. § 5311(1). To that end, one provision of the BSA, 31 U.S.C. § 5318(h)(1), requires financial institutions to "establish anti-money laundering and countering the financing of terrorism programs" that must meet certain minimum requirements. Another provision, 31 U.S.C. § 5318(g), permits the Secretary of the Treasury (Secretary) to "require any financial institution" or any of its agents "to report any suspicious transaction relevant to a possible violation of law or regulation." The Secretary has delegated the authority to implement, administer, and enforce the provisions of the BSA to the Director of FinCEN. *See* Treasury Order 180-01, Paragraph 3(a) (Jan. 14, 2020).

In response to new and emerging threats of illicit finance, Congress has continued to enact legislation to supplement the government's ability to detect and prosecute financial crime. The Anti-Money Laundering Act of 2020 (AML Act) adopts various provisions designed to "modernize" federal "anti-money laundering" laws and those "countering the financing of terrorism." National Defense Authorization Act (NDAA), Pub. L. No. 116-283, § 6002(2), 134 Stat. 3388, 4604 (2021). Among Congress's purposes in passing the AML Act was to support FinCEN's mission "to safeguard the financial system from illicit activity, counter money

---

[1] Parts of the Currency and Foreign Transactions Reporting Act of 1970, Pub. L. No. 91-508 § 121, 84 Stat. 1114 (1970), its amendments, and other statutes relating to the subject matter of that Act are referred to as the BSA, which is codified at 12 U.S.C. §§ 1829b, 1951–60 and 31 U.S.C. §§ 5311–14, 5316–36.

laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence." *Id.* § 6102(a) ("Strengthening FinCEN.").

Through the AML Act, Congress thus amended the BSA in two respects relevant here. First, Congress directed FinCEN to "establish streamlined . . . processes to, as appropriate, permit the filing of noncomplex categories of reports" of suspicious financial activity. *Id.* § 6202 (codified at 31 U.S.C. § 5318(g)(5)(D)(i)(I)). Second, Congress amended the BSA to authorize FinCEN (through its delegated authority from the Secretary) to "require a class of domestic financial institutions" to collect and report information that it "may prescribe by regulation, to . . . guard against money laundering, the financing of terrorism, or other forms of illicit finance." 31 U.S.C. § 5318(a)(2).

## II.    FinCEN's Regulation of Real Estate Transactions

### A.    FinCEN's Use of Geographic Targeting Orders

Real estate transactions have long been an area of concern for their vulnerability to money laundering, terrorist financing, and other harmful economic activity. Indeed, Congress included any "persons involved in real estate closings and settlements" within the regulated class of financial institutions subject to the BSA. 31 U.S.C. § 5312(a)(2)(U). FinCEN has observed that "[m]ost transfers of residential real estate are associated with a mortgage loan or other financing provided by financial institutions" that are required to maintain anti-money laundering programs. 89 Fed. Reg. at 70,259. However, as "non-financed transfers do not involve such financial institutions," they have been "exploited by illicit actors" including "persons engaged in fraud or organized crime," "international drug cartels, human traffickers, and corrupt political or business figures." *Id*.

While FinCEN has generally exempted real estate transactions "from comprehensive regulation under the BSA," it has since 2016 "used a targeted reporting requirement" for certain real estate transactions known as Residential Real Estate Geographic Targeting Orders (GTOs). *Id.* at 70,258-259; *see* 31 U.S.C. § 5326 (authorizing Secretary to require reporting from, among

others, financial institutions in a "geographic area"). FinCEN has used these GTOs "to collect information on a subset of transfers of residential real estate that FinCEN considers to present a high risk for money laundering." 89 Fed. Reg. at 70,259. These GTOs "have required certain title insurance companies to file reports and maintain records concerning non-financed purchases of residential real estate above a specific price threshold by certain legal entities in select metropolitan areas of the United States." *Id.* at 70,259-260.

The GTOs have been effective in identifying suspicious activity within their covered geographic areas. Law enforcement has reported that the purchases reported under the GTOs have been used "to generate new investigative leads, identify new and related subjects in ongoing cases, and support prosecution and asset forfeiture efforts." *Id.* at 70,260. At law enforcement's request, FinCEN has expanded the GTOs "to new geographic areas . . . adding both additional metropolitan areas and methods of payment." *Id.* Furthermore, by cross-referencing the reports made under the GTOs with the other types of reports required under the BSA, FinCEN discovered "that a substantial proportion of purchases reported under" the GTOs were conducted by individuals "also engaged in other activity that financial institutions have characterized as suspicious." *Id.* Specifically, FinCEN "found that from 2017 to early 2024, approximately 42 percent of non-financed real estate transfers" reported under the GTOs were conducted by individuals or entities that were the subject of a suspicious activity report filed by a regulated financial institution. *Id.*

Despite the effectiveness of the GTOs, FinCEN determined that their limited geographic reach was a "significant shortcoming" because they failed to capture a large swath of money laundering accomplished through real estate transfers in this country. *Id.* A 2021 study of money laundering through real estate "found that, of Federal money laundering cases involving real estate between 2016 and 2021, nearly 61 percent involved at least one transfer in a county not covered" by the GTOs. *Id.* (citing Lakshmi Kumar & Kaisa de Bel, Global Fin. Integrity, *Acres of Money Laundering: Why U.S. Real Estate is a Kleptocrat's Dream* (Aug. 2021), *available at* https://gfintegrity.org/wp-content/uploads/2021/08/Acres-of-Money-Laundering-Final-Version-2021.pdf). Because the evidence showed that money laundering through real estate was a

4

"nationwide problem," FinCEN considered the "jurisdictionally limited reporting requirements" of the GTOs to be "insufficient." 89 Fed. Reg. at 70,260. Moreover, FinCEN intended the GTOs "to be a temporary information collection measure," and not a substitute for a the "more comprehensive and permanent regulatory approach" that it believed necessary for the wide scope of the issue. *Id.*

### B.    FinCEN's Final Rule

To address these concerns, FinCEN issued its Rule on residential real estate reporting in August 2024. FinCEN invoked its statutory authority under the BSA to require "persons involved in real estate closings and settlements," 31 U.S.C. § 5312(a)(2)(U), to report "suspicious transactions relevant to a possible violation of law or regulation," and its additional authority to tailor that reporting requirement, *id.* §§ 5312(g)(1), (g)(5)(D). 89 Fed. Reg. at 70,259. FinCEN also relied on the authority provided by the AML Act (codified at 31 U.S.C. § 5318(a)(2)) to require reporting of certain information prescribed by regulation that would be useful to guard against money laundering and other forms of illicit finance. *Id.* at 70,259 n.11.

The Rule imposes a "streamlined suspicious activity report (SAR) filing requirement" that requires certain "reporting persons, as defined," "to file a 'Real Estate Report' on certain non-financed transfers of residential real property to legal entities and trusts." *Id.* at 70,258. Unlike the GTOs that FinCEN deemed insufficient, the Rule is not limited by geographic area within the United States or by a specific dollar threshold for the transaction. The Rule becomes effective on December 1, 2025. *Id.* at 70,277.

In specifics, the Rule generally requires a "reportable transfer" be "reported to FinCEN by the reporting person." *Id.* at 70,290 (to be codified at 31 C.F.R § 1031.320(a)). The Rule defines a "reportable transfer" as "a non-financed transfer to a transferee entity or transferee trust of an ownership interest in residential real property" subject to several exceptions, including one that accounts for many transfers commonly made for estate planning purposes and another that exempts transfers "resulting from the death of an individual," along with other types of transfers that FinCEN found to present a low risk of money laundering. 89 Fed. Reg. at 70,290 (to be codified

at 31 C.F.R § 1031.320(b)).[2]  For these purposes, "residential real property" encompasses several categories of domestic property intended "principally for occupancy by one to four families" and shares in a cooperative housing corporation.  *Id.*  A "non-financed transfer" of an ownership interest in such property is a "transfer that does not involve an extension of credit to all transferees" that is secured by the property at issue and extended by a financial institution that is subject to certain other BSA requirements.  89 Fed. Reg. at 70,293 (to be codified at 31 C.F.R § 1031.320(n)(5)).

Although different types of real estate professionals may be involved in any given transfer of real estate, only the "reporting person" is required to file a Real Estate Report.  Whether a real estate professional is the "reporting person" in any given transaction is determined by their role in the transfer, including whether they are the "closing or settlement agent," the person filing the legal "instrument that transfers ownership of the residential real property," or another eligible person designated to make the report for that transaction.  89 Fed. Reg. at 70,290 (to be codified at 31 C.F.R § 1031.320(c)).

The reports required by the Rule must include general identifying information about the reporting person, the transferor, and the transferee entity or trust.  89 Fed. Reg. at 70,290-92 (to be codified at 31 C.F.R § 1031.320(d), (e), (f)).  The report also must contain basic information regarding the residential real property (such as the street address and the legal description of any real property) and certain transactional information about the transfer (including the amount of the payment and the method by which it was made).  89 Fed. Reg. at 70,292 (to be codified at 31 C.F.R § 1031.320(g), (h)).

### III.    Procedural History

Plaintiffs filed this action on April 17, 2025.  Compl., ECF No. 1.  Plaintiff Jason Corley alleges that he is the owner of residential property in Slaton, Texas, and he "wishes to transfer this

---

[2] FinCEN declined to adopt a "dollar threshold for reporting," explaining that its "experience . . . and discussions with law enforcement shows that money laundering through real estate occurs at all price points" and that "incorporation of a dollar threshold could move illicit activity into the lower priced market . . . ."  89 Fed. Reg. at 70,269.

property into a corporate entity" that he owns. *Id.* ¶¶ 51-52. Plaintiff Zachary Long, a real estate and estate planning attorney in Lubbock, Texas, provides legal services to facilitate the transfer of real property. *Id.* ¶¶ 41-42. Plaintiffs primarily claim that the Rule exceeds Congress's enumerated powers in violation of the Constitution. *Id.* ¶¶ 56-69. Plaintiffs also challenge the Rule under the Administrative Procedure Act (APA), 5 U.S.C. § 702. *Id.* ¶¶ 70-75. Plaintiffs seek injunctive and declaratory relief that the Rule "is unconstitutional on its face" and further seek to set aside the Rule under the APA. *Id.* at 14.[3] Plaintiffs have now filed a motion for summary judgment on both counts of their complaint. ECF No. 10.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cross-motions for summary judgment "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004).

## ARGUMENT

The Rule represents a proper exercise of Congress's power for multiple independent reasons. First, the Rule regulates commercial transactions within the nation's large and significant residential housing market and is therefore directly authorized by the Commerce Clause. Second, the Rule is also authorized by the Commerce Clause because it forms a critical part of the government's comprehensive anti-money laundering regime. Third, the Rule effectuates various powers vested in the federal government, including the commerce, foreign affairs, and national-security powers, and is therefore authorized by the Necessary and Proper Clause. Any of these bases suffices to defeat Plaintiffs' challenge, and Defendants are therefore entitled to summary judgment in their favor.

---

[3] While the Complaint also invokes Rule 65 and asks for "a preliminary injunction against the Defendants," Plaintiffs have not separately filed a motion for such relief, and Defendants do not understand Plaintiffs to be seeking any preliminary relief at this time.

Moreover, Plaintiffs have chosen to mount a facial, pre-enforcement challenge to invalidate the Rule, "and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). The Supreme Court has made facial challenges "hard to win" because they "'often rest on speculation' about the law's coverage and its future enforcement" and "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451-52 (2008)). Plaintiffs thus cannot succeed on their facial challenge unless they establish that the Rule "is unconstitutional in all of its applications." *See Wash. State Grange*, 552 U.S. at 449; *see also City of Chicago v. Morales*, 527 U.S. 41, 81 (1999) (Scalia, J., dissenting) (noting defendant may "defeat [a] facial challenge by conjuring up *a single valid application* of the law"). The possibility that a regulation "may be invalid as applied" in some cases "does not mean that the regulation is facially invalid." *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991) (addressing a facial challenge under the Immigration and Nationality Act); *see also Bondi v. VanDerStok*, 145 S.Ct. 857, 865-66 (2025) (adopting same standard to address facial, pre-enforcement challenge to agency rule).

## I.    The Rule falls within Congress's enumerated powers.

### A.    *Congress has expansive authority to enact economic regulations.*

The Constitution vests Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This authority encompasses "the power to enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; [and] 'to foster, protect, control and restrain.'" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937) (internal citations omitted). Congress's power in this realm "can be expansive," and may reach "seemingly local matters" in certain circumstances. *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 536-37 (2012) (op. of Roberts, C.J.). Indeed, in addition to regulating the "channels" and "instrumentalities" of interstate commerce, Congress may "regulate activities that substantially affect interstate commerce," even if such activities are "purely local." *Gonzales v. Raich*, 545 U.S.

1, 16-17, 34 (2005) (citations omitted); *see also, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (commerce power "may be exercised in individual cases without showing any specific effect upon interstate commerce; it is enough that the individual activity when multiplied into a general practice is subject to federal control . . . or that it contains a threat to the interstate economy that requires preventive regulation").

When assessing Congress's power under the Commerce Clause, the court "need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22 (citing *United States v. Lopez*, 514 U.S. 549, 557 (1995)). Supreme Court precedent recognizes multiple "historically rooted means of congressional regulation under the commerce power: (1) whether the activity is 'any sort of economic enterprise, however broadly one might define those terms'; or (2) whether the activity exists as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 205 (5th Cir. 2000) (quoting *Lopez*, 514 U.S. at 561).[4]

The Necessary and Proper Clause, moreover, authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its other enumerated powers and the powers vested in the Executive Branch. U.S. Const. art. I, § 8, cl. 18. The Clause "makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive,' to the authority's 'beneficial exercise.'" *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819)). It is therefore sufficient if "the statute

---

[4] Plaintiffs' suggestion that Court apply some heightened standard of "evidence-based, federalism-sensitive" rational basis review (at 13-14) is inconsistent with Supreme Court and Fifth Circuit precedent. *See, e.g.*, *Raich*, 545 U.S. at 22 (when reviewing Commerce Clause challenge, court's "task . . . is a modest one"); *Lopez*, 514 U.S. at 557 (judicial inquiry is "to decide whether a rational basis existed for concluding a regulated activity sufficiently affected interstate commerce"); *Groome*, 234 F.3d at 203 ("[T]he *Lopez* court reaffirmed the rational basis test by which we are bound to evaluate the constitutionality of congressional actions.").

constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

> **B.      The Rule regulates economic activity well within the Commerce Clause.**

**1.** The Rule is authorized by the Commerce Clause because it regulates economic activity with a substantial effect on interstate commerce. At its core, the Rule applies to an economic enterprise: the transfer of real property from the hands of one person to another. After all, to "transfer" real property means "[a]ny mode of disposing or parting with an asset or an interest in an asset" or otherwise completing the "conveyance of property or title from one person to another." *See* Transfer, Black's Law Dictionary (12th ed. 2024). It is hardly novel to suggest that the transfer of real property—however accomplished and whatever consideration paid—is an economic act.

The Fifth Circuit reached this same (and unremarkable) conclusion in *Groome*, holding that "it a transparently commercial action to buy, sell, or rent a house." 234 F.3d at 206. "Not only is it quite literally a 'commercial transaction,' but viewed in the aggregate, it implicates an entire commercial industry." *Id.* In *Groome*, the plaintiff argued that a provision of the Fair Housing Amendments Act—which prohibits discrimination against disabled persons in the purchase, sale, or rental of housing—regulated activity that was not economic, and therefore outside the commerce power. The court rejected that contention, reasoning that "the commercial transaction of purchasing a home . . . fits well within the broad definition of economic activity established by the Supreme Court and other circuits." *Id.* at 205. As *Groome* explained, the "purchase of a house is 'commercial intercourse' at its purest form, involving capital outlay, financing and mortgage arrangements, profit, debt, and investment considerations." *Id.* at 206 (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1 (1824)). These features "speak[] to both the 'commercial character' and economic nature of the transaction." *Id.*

*Groome* controls the analysis here. While the Fifth Circuit did not opine directly on a "non-financed transfer" of residential property, its logic did not rely on the financing (or lack thereof) of any one particular transaction. Instead, the character of the regulated activity, particularly when viewed in the aggregate, was at the heart of *Groome*'s conclusion that transferring residential

property is a "commercial transaction." *Id.* at 206 & n.18 (noting the "tremendous economic significance" of the nation's "residential housing market"). In any event, even when residential property is transferred without financing—either sold through an all-cash transaction or conveyed for no consideration at all—the transaction is still likely to involve other factors that *Groome* considered as "supporting [its] commercial nature," including, among other things, "realtors, brokers, title insurance, title registration and legal fees," which are both commercial and often "involve actors with interstate ties." *Id.* at 206 n.19. In fact, one of the plaintiffs here appears to earn legal fees by providing these sorts of "real estate closing and settlement services" and is engaged by his clients to "facilitate the transfer of residential real property," often "into corporate entities or trusts." Pls.' Br. at 7-8. That itself speaks to the "commercial character" of the typical real estate transaction. *See Groome*, 234 F.3d at 206; *see also Seniors Civil Liberties Ass'n Inc. v. Kemp*, 965 F.2d 1030, 1034 (11th Cir. 1992) ("We find no merit in plaintiffs' argument that, because the real estate market involves private intrastate transactions, no interstate commerce is involved in residential sales and rentals.").

Under *Groome*, there is a rational basis for concluding that the Rule's reporting requirement substantially affects interstate commerce. It regulates both individual real estate transactions and the overall market for residential real estate by requiring the reporting of any "reportable transfer," which is generally defined as a "a non-financed transfer to a transferee entity or transferee trust of an ownership interest in residential real property." 89 Fed. Reg. at 70,290. The Rule's focus on transfers makes plain that the regulation is targeted at economic activity. Although each "reportable transfer" is "non-financed" as defined by the Rule, it is nonetheless "literally a 'commercial transaction'" that is part of the nation's large and significant "residential housing market." *Groome*, 234 F.3d at 206 & n.18.

Setting common sense aside (and ignoring *Groome*'s discussion entirely), Plaintiffs insist (at 14) that "the simple transfer, without financing, of a piece of non-commercial real property is not an economic activity." Remarkably, Plaintiffs cite no authority for this far-reaching proposition. Instead, they seem to argue (at 16-17) that a real estate transaction cannot be

11

economic unless financing is involved or "money changes hands" somehow. Although money changing hands is certainly a classic hallmark of economic activity, nothing in Supreme Court or Fifth Circuit jurisprudence suggests that the commerce power is limited to transactions in which money in exchanged. If anything, the case law establishes that there is no such limitation: the government may regulate "purely local" activities under the commerce power so long as there is "rational basis" for concluding that those activities, "taken in the aggregate, substantially affect interstate commerce." *Raich*, 545 U.S. at 22.

Therefore, irrespective of any exchange of money, the Court has upheld the regulation of the intrastate cultivation and possession of marijuana for personal use, *id.* at 15, and the intrastate farming of wheat for home consumption, *Wickard v. Filburn*, 317 U.S. 111, 127-29 (1942). And unlike the fully homebound activities at issue in those cases, the regulated activity here involves property or rights to property (and typically, if not always, money) changing hands from one person to another. Plaintiffs cite no authority to suggest that this sort of transaction falls outside the "broad definition of economic activity established by the Supreme Court." *Groome*, 234 F.3d at 205. For good reason: the transfer of property from one to another, whether denominated as "trade," "traffic," or "intercourse," surely constitutes commerce. *See GDF Realty Invs. Ltd. v. Norton*, 326 F.3d 622, 629 (5th Cir. 2003) (citations and internal quotation marks omitted) (reaffirming broad swath of economic activities subject to the commerce power).

Plaintiffs repeatedly rely (at 17, 25) on the observation made in *Terkel v. Centers for Disease Control & Prevention* that "[r]eal estate is inherently local" because "buildings do not move across state lines." *See* 521 F. Supp. 3d 662, 671 (E.D. Tex. 2021). That reliance is misplaced. While the point concerning the immobility of buildings is true enough, that fact was not the deciding factor in the case. *Terkel* concerned a Commerce Clause challenge to the government's COVID-19 eviction moratorium, so the court focused its analysis on the *activity* being regulated in connection with real estate: there, it was "only eviction." *Id.* at 671-72. As the court noted, the order regulated the ability to vindicate "the property owner's possessory interest" in any one property and disclaimed any effect on the "landlord's or tenant's financial obligations."

*Id.* Because the regulated activity was "only recourse to a remedy under state law," it was not "itself economic in character." *Id.* Here, to the contrary, the Rule nowhere "regulates property rights in buildings." *Id.* It imposes a reporting requirement on the *actual transfer* of real estate, not the *ability* of property owners under state law to sell, donate, relinquish or otherwise transfer their property. Moreover, the Rule does not disclaim "any change in financial obligations;" rather, it regulates all property transfers that come within its ambit, regardless of whether that transaction affects the finances of the parties involved.

Plaintiffs also invoke a district court's opinion (ruling on a motion for a preliminary injunction) rejecting the government's ability to require commercial entities to report their ownership information to FinCEN under the Corporate Transparency Act. Pls.' Br. at 17-18 (citing *Smith v. U.S. Dep't of the Treasury*, 761 F. Supp. 3d 952 (E.D. Tex. 2025)). Regardless of the merits of that decision, the case is readily distinguishable. The Rule here expressly targets "economic activity"—something *Smith* itself recognized would properly be subject to regulation under the Commerce Clause. *See id.* at 967-68 (distinguishing regulation of corporate entities' existence from that of transactions in which the entity may eventually engage); *GDF Realty*, 326 F.3d at 634 (directing inquiry to the "expressly regulated activity"). As explained above, transferring real property is by itself an economic activity, without regard to its "downstream consequences or possible economic motivations." *Smith*, 761 F. Supp. 3d at 966. Anyhow, Plaintiffs neglect to mention that the *Smith* court later stayed its injunction pending appeal in light of the Supreme Court's order staying a similar injunction in a parallel case, *McHenry v. Texas Top Cop Shop*, No. 24A653, 604 U.S. ---, 2025 WL 272062, at *1 (U.S. Jan. 23, 2025), *see* Order, Case No. 6:24-cv-336-JDK (E.D. Tex. Feb. 17, 2025), ECF No. 39.[5]

---

[5] Several other courts have reached contrary conclusions on Congress's power to require the reporting of ownership information under the law at issue in *Smith*. *See, e.g.*, *Boyle v. Bessent*, 2025 WL 509519, at *17 (D. Me. Feb. 14, 2025) (upholding law under commerce power on motion for summary judgment); *Cmty. Ass'ns Inst. v. Yellen*, 2024 WL 4571412, at *7 (E.D. Va. Oct. 24, 2024) (same on motion for preliminary injunction); *Firestone v. Yellen*, 2024 WL 4250192, at *7 (D. Or. Sept. 20, 2024) (same on motion for preliminary injunction).

Even if Plaintiffs could point to an edge case where the transfer of residential real property was wholly non-economic in nature—a tall task under *Groome*—that too would not suffice. The Supreme Court "has never required Congress to legislate with scientific exactitude." *Raich*, 545 U.S. at 17. Rather, "[w]hen Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (citations and quotation marks omitted). And when "that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Id.* at 23.

In any case, Plaintiffs appear to concede (at 16-17) that the Rule would be a permissible regulation of a property transfer where "money changes hands" (even if the transaction is itself "non-financed" within the meaning of the Rule). In other words, under Plaintiffs' theory, the Rule could properly require reporting of an all-cash sale of residential property to a trust or legal entity even if it could not require such reporting for a gift or otherwise gratuitous transfer for no consideration. That concession dooms their facial challenge. *See Moody*, 603 U.S. at 723.

**2.** The Rule is also authorized by the Commerce Clause for another, independent reason: its reporting requirements form a critical part of the federal government's comprehensive anti-money laundering regime. "[M]oney laundering is a quintessential economic activity." *United States v. Goodwin*, 141 F.3d 394 (2d Cir. 1997); *see* 89 Fed. Reg. at 75,261 (recognizing "wide-ranging impacts that money laundering through real estate can have on tenants, homebuyers, and the affordability and stability of regional housing markets"). The same is true of fraud, drug trafficking, and other financial crimes targeted by the Rule. *See United States v. McClaren*, 13 F.4th 386, 402 (5th Cir. 2021) (drug trafficking is economic activity); *see also Groome*, 234 F.3d at 208 (discussing breadth of "economic activity"). "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *Goodwin*, 141 F.3d at 399. Plaintiffs do not dispute that the federal government may, pursuant to the Commerce Clause, prohibit harmful economic activity.

Various economic crimes—including money laundering, drug trafficking, bribery, sanctions evasion, and fraud of all sorts—involve real estate transactions. "Numerous public law

14

enforcement actions illustrate this point." 89 Fed. Reg. at 75,259 & n.12 (collecting examples of criminal prosecutions that involved real estate transactions). The examples are legion in this district alone. *See*, *e.g.*, U.S. Department of Justice, Press Release, Texas Business Owner Sentenced for COVID-19 Relief Fraud (June 26, 2025) (woman who "conspired to submit 17 fraudulent PPP loan applications" used the fraud proceeds "to purchase property in the greater Dallas area"); U.S. Department of Justice, Press Release, Texas Pharmacist Sentenced to Over 17 Years in Prison and Ordered to Forfeit $405M in Assets for Defrauding the Department of Labor (Mar. 10, 2025) (defendant's laundering of fraud proceeds resulted in forfeiture of "real estate in Dallas and Austin worth $8 million").

FinCEN issued the Rule to address the criminal activity that pervades non-financed transfers of residential real estate. After examining its own experience with the GTOs and reviewing studies that confirmed their shortcomings, FinCEN determined that its prior approach was "insufficient to address" the "nationwide problem" of "money laundering through real estate." 89 Fed. Reg. at 70,259-60. Consistent with Congress's intent that it "continue to safeguard the financial system" and "counter money laundering and the financing of terrorism," NDAA § 6102(a)(1), FinCEN thus issued a Rule reflecting the "more comprehensive and permanent regulatory approach" that it believed was "needed" to address the high risk of illicit finance in this area. 89 Fed. Reg. at 70,260. The Rule is "critical" to "alert law enforcement to the fact that a residential real estate transfer fitting within a known money laundering typology has taken place." *Id.* at 70,280. Failing to collect information from those who facilitate these non-financed transactions would leave a "gaping hole" in FinCEN's efforts to curb money laundering through real estate. *See Raich*, 545 U.S. at 22; *see also GDF Realty*, 326 F.3d at 639-40.

Plaintiffs do not meaningfully contest any of this. Though they acknowledge (at 20-21) that FinCEN's findings "suggest that suspicious activities coincide with real-estate transfers," they discount that finding as a pretext for FinCEN to gather "more information." That assertion ignores FinCEN's conclusion that its prior efforts had fallen short, and thus "confirmed the need for a more permanent regulatory solution that would require consistent reporting of information about certain

high-risk real estate transfers." 89 Fed. Reg. at 70,260.  FinCEN thus exercised its lawful authority under the BSA to require reporting of transactions that it concluded would be "highly useful" in "criminal, tax, or regulatory investigations."  31 U.S.C. § 5311(1); *see also id.* § 5318(a)(2) (authorizing Secretary to require reports of information prescribed by regulation "to guard against money laundering, the financing of terrorism, or other forms of illicit finance"); *id*. § 5318(g)(1) (authorizing Secretary to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation").  While Plaintiffs may disagree with FinCEN's determination, their subjective opinion must give way to the elected Branches' considered judgment on the matter. And Plaintiffs anyway identify no basis to second-guess FinCEN's judgment here.  *Cf. Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 283 (1981) ("[T]he effectiveness of existing laws in dealing with a problem identified by Congress is ordinarily a matter committed to legislative judgment.").

### C.    The **Lopez/Morrison** *factors confirm the Rule's constitutionality.*

Plaintiffs point the Court to four factors suggested by the Supreme Court in *Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000), as guidance for determining whether a rational basis exists for the conclusion that the activity regulated here substantially affects interstate commerce.  Pls.' Br. at 14.  The Court's subsequent decision in *Raich*, however, shows that consideration of the *Lopez*/*Morrison* factors is unnecessary where, as here, clear precedent establishes that regulation of a class of activities is permissible under the Commerce Clause, and that those activities are "quintessentially economic."  *See* 545 U.S. at 17-26.  Even so, consideration of the four *Lopez/Morrison* factors confirms that the Rule falls well within the commerce power.

The first factor is the "'economic nature of the regulated activity.'"  *Groome*, 234 F.3d at 204 (quoting *Morrison*, 529 U.S. at 610).  The Fifth Circuit has described this as the "key question" of this analysis.  *GDF Realty*, 326 F.3d at 630.  The Rule easily satisfies this key factor.  As explained in detail above, the regulated activity here—the transfer of property from one person to

another—is economic in nature.  Disposing of residential real property is "transparently commercial action" that, "viewed in the aggregate, . . . implicates an entire commercial industry." *Groome*, 234 F.3d at 206.  The activity typically involves the use of "license[d] businesses and individuals" like law firms, title companies, and real estate brokers and often has a "commercial purpose."  *See United States v. Ho*, 311 F.3d 589, 602 (5th Cir. 2002) (finding asbestos removal to be commercial activity when it involved similar considerations).

Plaintiffs' argument (at 14-18) that transferring real estate "is not economic in nature" falls flat.  They primarily rely on *Terkel* and *Smith*, but (as shown above) neither of those district court opinions discussed regulation of a "transparently commercial action."  *Groome*, 234 F.3d at 206. The regulated activity here is even further afield from that in *GDF Realty*, a Fifth Circuit case on which Plaintiffs rely.  326 F.3d at 636.  *GDF Realty* held that the "takes" of certain endangered species was not a commercial activity even though the motivations underlying the takes were themselves economic.  *Id.*[6]  But the Court need not examine any motivations here.  Unlike the taking of an endangered species, the transfer of property or rights in property is an economic transaction regardless of the underlying motivation of the actors.  "[T]he *object of the regulation*" plainly relates to interstate commerce irrespective of the regulated activity's downstream economic effect.  *Id.* at 634 (emphasis in original).

The second factor asks whether the regulation contains an "jurisdictional element." *Groome*, 234 F.3d at 211.  This factor is primarily relevant in cases where there is "no obvious interstate economic connection" between the regulated activity and interstate commerce.  *Id.* Given the "explicit economic nature" of real estate transactions and the residential housing market, this case "presents a very different situation than cases challenging non-economic and non-commercial regulatory acts."  *See id.*; *see also United States v. Robinson*, 119 F.3d 1205, 1212 (5th Cir. 1997) ("Even in the absence of such a [jurisdictional] statutory requirement, we will

---

[6] The *GDF Realty* court went on to hold that the regulation was permissible under the Commerce Clause as necessary to ensure the efficacy of a larger economic regulatory scheme. 326 F.3d at 640.

uphold the challenged statute if the regulated conduct's connection to interstate commerce is manifest."). While the Rule does not limit its application to connection with interstate commerce, the connection to such commerce is clear. And beyond the obvious connection to the interstate housing market, the Rule was promulgated under FinCEN's authority under the BSA to combat the nationwide problem of money laundering, terrorist financing, and other illicit financial activity, 31 U.S.C. §§ 5311, 5318, all proper areas for regulation under the commerce power.

Plaintiffs are mistaken to assert (at 18-19) that FinCEN "disavow[ed] a jurisdictional element" and "intended to remove jurisdictional barriers with the Rule" in this context. This assertion confuses the legal jurisdiction of Congress to regulate (*Lopez/Morrison*'s concern) with the jurisdictional reach of a particular reporting requirement (FinCEN's concern). FinCEN's statements described the "jurisdictional limit[s]" of its GTOs, which were confined to transactions of "residential real estate above a specific price threshold" that were conducted by "certain legal entities" and "in select metropolitan areas of the United States." 89 Fed. Reg. at 70,260. FinCEN determined that these jurisdictional restrictions rendered the GTOs insufficient to address adequately the risks posed by non-financed residential real estate transactions nationwide. *Id.* Nothing in FinCEN's commentary touched on the agency's supposed rejection or disavowal of the jurisdictional element for interstate commerce as outlined in *Lopez* or *Morrison*.

The third factor considers any congressional findings regarding the regulated activity's "substantial effects on interstate commerce." *Ho*, 311 F.3d at 600. This is the "least important" of the factors; findings are "neither necessary nor sufficient," but only "helpful insofar as they aid the courts in identifying a substantial effect on commerce." *Id.* In other words, a lack of findings matters less where, as here, the regulated activity's "substantial effects on interstate commerce are 'visible to the naked eye.'" *Id.* at 603 (quoting *Lopez*, 514 U.S. at 563). Regardless, as detailed above, FinCEN made express findings that "money laundering through real estate is indeed a nationwide problem," which can have "wide ranging impacts . . . on tenants, homebuyers, and the affordability and stability of regional housing markets." 89 Fed. Reg. at 70,260-61. FinCEN moreover found that the "Real Estate Reports . . . will allow Treasury and law enforcement to

connect money laundering through real estate with other types of illicit activities and to conduct broad money laundering trend analyses." *Id.* at 70,273.  The Rule thus advances the precise mission that Congress set out for the agency. *See* NDAA § 6102(a)(1).

The fourth and final factor is the "degree of attenuation" between the regulated activity and a substantial effect on interstate commerce. *Ho*, 311 F.3d at 601.  Like the anti-discrimination law in *Groome*, the Rule here presents no need "for several logical links to connect the regulated activity with commerce as in *Lopez* and *Morrison*." 234 F.3d at 215.  It takes no "inference upon inference" to see that a regulation aimed at combatting illicit finance and money laundering in the residential real estate market—activities that FinCEN found to introduce market distortion and impact housing market stability—"directly affects the housing industry and the economy." *See id.*

Plaintiffs' last-ditch argument is that the government must show that the regulation is "proper" even if it otherwise satisfies the *Lopez/Morrison* factors. *See* Pls.' Br. at 23.  They fail to cite any controlling precedent for this contention, instead relying only on two Supreme Court concurrences in which no other Justices joined.[7]  But any Supreme Court opinion "that does not command a majority vote is not binding precedent." *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013).  This Court is instead bound by the Court's majority opinions in *Lopez*, *Morrison*, and *Raich*, and the Fifth Circuit's interpretation of those precedents in *Groome*, *GDF Realty*, and *Ho*.  As discussed in detail above, these decisions show that Plaintiffs cannot meet

---

[7] Plaintiffs assert that the Part of Chief Justice Roberts's opinion in *NFIB*, addressing the Commerce and Necessary and Proper Clauses—in which no other Justice joined—should be applied here because four dissenters advanced the same reasoning. *See* Pls.' Br. at 13 n.3.  The Fifth Circuit disagrees: "[A]ny intimation that the views of dissenting Justices can be cobbled together with those of a concurring Justice to create a binding holding must be rejected." *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020).
    What's more, this Court has previously rejected a litigant's suggestion that it read the Chief Justice's solo opinion in *NFIB* as binding precedent by conglomerating the "the opinions of the four dissenting Justices with the Chief Justice's opinion, even though the dissenters did not join *any* portion of the Chief Justice's opinion, or concur in the judgment." *See United States v. Spann*, 2012 WL 4341799, at *3 (N.D. Tex. Sept. 24, 2012) (emphasis in original); *see also Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 734 (W.D. Tex. 2019) (admonishing plaintiff for "repeatedly, but improperly, refer[ing] to a solo concurrence in [*NFIB*] as the Court's holding").

19

their burden of showing that no rational basis exists for concluding that the Rule substantially affects interstate commerce.

*     *     *

At bottom, the Rule requires reports of certain commercial activity within the "residential housing market," an industry sector that the Fifth Circuit has recognized as having "tremendous economic significance to the national economy." *Id.* at 206 n.18. Plaintiffs' steadfast refusal to acknowledge the fundamental economic nature of this regulated activity underscores the weakness of their position. Far from the "unlimited expansion of federal power" of which Plaintiffs warn (at 22-23), the Rule is limited to regulation of quintessentially economic activity within a regulated and nationwide market, which the Supreme Court has for decades upheld under the Commerce Clause. *See Ho*, 311 F.3d at 604 (noting these "important limiting principles" in this context).

While Plaintiffs propose a series of hypotheticals, they do not explain why activities like "possession of expensive personal items" or inviting "illegal aliens" into one's home are relevantly similar to the economic transaction of transferring residential real estate to a trust or other legal entity. And reporting requirements for economic activities of all sorts have long been understood to be constitutional. *See, e.g.*, 26 U.S.C. §§ 6012, 6031-60 (requiring taxpayers to file tax returns and various entities to file tax information returns); 8 U.S.C. § 1324a (requiring employers to collect and make available information about new employees' eligibility to work); 52 U.S.C. § 30104 (requiring political campaigns to report contributions and expenditures); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-60 (1974) ("[A] contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States."). The Rule thus falls squarely within the government's longstanding ability to regulate under the commerce power.

### D.    *The Rule is necessary and proper to effectuate the government's other powers.*

The Rule is moreover authorized as necessary and proper for carrying into execution the commerce power and other powers vested in the federal government, including the foreign affairs and national security powers. Plaintiffs acknowledge (at 12-13) that the Necessary and Proper

20

Clause provides the government additional authority to enact law but confine their analysis to the commerce power. The clause is not so narrow. Rather, "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). The same is true for matters pertaining to national security, which are "the prerogative of the Congress and President." *Ziglar v. Abbasi*, 582 U.S. 120 (2017); *see also Ullmann v. United States*, 350 U.S. 422, 436 (1956). Where "the political branches have adequately substantiated" their judgment that regulating certain conduct is necessary to meet identified national security needs, courts must accord that judgment "significant weight." *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010).

As explained above, Congress reasonably determined that money laundering, terrorism financing and other illicit financial activity posed a threat to the nation's markets and national security and it enacted the BSA and the AML Act to ensure that Treasury (and FinCEN) could take the necessary measures to address the risks posed by those destructive activities. *See, e.g.*, 31 U.S.C § 5311 (including within the BSA's purposes to "protect the financial system" and "safeguard the national security" of the United States); NDAA § 6102(a)(1) ("It is the sense of Congress that the mission of FinCEN should be to continue to safeguard the financial system from illicit activity, . . . and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.").

The Executive has likewise "long recognized the illicit finance risks posed by criminals and corrupt officials who abuse opaque legal entities and trusts to launder ill-gotten gains through transfers of residential real estate." 89 Fed. Reg. at 70,258. "This illicit use of the residential real estate market threatens U.S. economic and national security and can disadvantage individuals and small businesses that seek to compete fairly in the U.S. economy." *Id.* FinCEN assessed that the Rule "will benefit national security by facilitating law enforcement investigations into, and strategic analysis of, the use of residential real estate transfers" that have certain money laundering typologies. *Id.* at 70,259. FinCEN also determined that the Rule would "enhance compliance with international standards by improving law enforcement's ability to identify the natural persons"

engaging in domestic real estate transactions, thereby "diminish[ing] the ability of corrupt and other illicit actors to launder their proceeds through real estate purchases in the United States." *Id.* at 70,277. "That evaluation of the facts by the Executive . . . is entitled to deference." *Holder*, 561 U.S. at 33-34. The elected Branches' commerce, foreign affairs, and national security powers, as amplified by the Necessary and Proper Clause, thus provide further lawful basis for the Rule.

## II.    Vacatur of the Rule in its entirety is not warranted.

Plaintiffs have also challenged the Rule under the APA as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see* Compl. ¶¶ 70-75. Since Plaintiffs' APA claim is derivative of their constitutional claim, it fails for the reasons already discussed. But even if the Court disagrees with Defendants' arguments, it should decline Plaintiffs' invitation to vacate the Rule in its entirety under the APA.[8] Although vacatur of an agency action is the "default rule in this Circuit," a "more limited remedy" can be appropriate in certain circumstances. *See Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (remanding for district court to determine the proper remedy for APA violation, whether "injunctive, declarative, or otherwise"), *aff'd*, 602 U.S. 406 (2024). Such circumstances exist here.

**1.** Plaintiffs' insistence on vacatur disregards the availability of other less burdensome remedies. Given that Plaintiffs appear to argue that the Rule exceeds the federal government's enumerated powers only in certain factual contexts—*e.g.*, a non-financed intrastate transfer of residential real estate that involves no exchange of money—injunctive relief, as opposed to

---

[8] Although Defendants recognize that the Fifth Circuit has previously accepted the argument that 5 U.S.C. § 706(2) authorizes vacatur of an agency action, *see Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022), Defendants respectfully contend that it does not. Section 706(2) is merely a rule of decision directing the reviewing court to disregard unlawful agency action in resolving the case before it; it does not dictate any particular remedy. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 451-52 (2017); *see id.* at 438 & n.121. The Supreme Court has not yet resolved "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA*, 145 S.Ct. 2540, 2554 n.10 (2025); *see also United States v. Texas*, 599 U.S. 670, 701-02 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (whether the APA authorizes vacatur is not "open and shut" as "[t]houghtful arguments and scholarship exist on both sides of the debate").

universal vacatur, would be a more appropriate remedy in this case. Unlike vacatur, injunctive relief could be tailored to prevent the Rule's application in any factual contexts where the Court determines that it would exceed the government's powers.

Plaintiffs point out that injunctive relief would not be available to persons like Plaintiff Corley, who is not a regulated person under the Rule but is nonetheless aggrieved by it. Pls.' Br. at 30 (citing *Corner Post, Inc. v. Board of Governors*, 603 U.S. 799, 826-29 (2024) (Kavanaugh, J., concurring)). Even if so, that has no bearing on the availability of a properly tailored injunctive remedy in *this* case. All agree that Plaintiff Long is a regulated party because of his role facilitating real property transfers, and the Court may thus issue appropriate injunctive relief. *Cf. Crawford v. Marion Cnty. Elec. Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("Only injunctive relief is sought, and for that only one plaintiff with standing is required.").

A narrower remedy would additionally have the salutary effect of "avoid[ing] rulings which may trench upon the authority of sister courts." *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985). Universal vacatur of the Rule, by contrast, would trench on the review of other plaintiffs' challenges to the Rule that are pending in other courts. *See Fidelity Nat'l Fin. Inc. v. Bessent*, Case No. 3:25-cv-554 (M.D. Fla.); *Flowers Title Cos., LLC v. Bessent*, Case No. 6:25-cv-127 (E.D. Tex.). Granting universal relief would undermine "the principle of comity" by providing other plaintiffs not before this court the very relief they are seeking from sister courts, regardless of whether those courts believe those plaintiffs are entitled to any relief. *See W. Gulf Mar. Ass'n*, 751 F.2d at 729 (advising federal district courts "to exercise care to avoid interference with each other's affairs"); *Texas*, 599 U.S. at 702-03 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (noting "vacatur can stymie the orderly review of important questions").

**2.** But even if this Court were to find that vacatur is an appropriate remedy, vacating the Rule in its entirety would ignore well-established severability principles. "Whether the offending portions of a regulation are severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provisions." *Texas v.*

23

*United States*, 126 F.4th 392, 419 (5th Cir. 2025) (internal quotations, alterations, and citations omitted).  Courts should adhere to the text of a regulation's severability clause unless extraordinary circumstances exist.  *Id.*

Although Plaintiffs make no mention of it, the Rule contains a severability clause.  89 Fed. Reg. at 70,277.  The clause conveys FinCEN's intent that any provisions or applications of the Rule held to be facially invalid or unenforceable shall be severable and "shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application."  *Id.*  And, as FinCEN explains, the Rule "can function sensibly if any specific provision or application is invalidated, enjoined or stayed."  *Id.* That makes particularly good sense here, as Plaintiffs do not challenge FinCEN's ability to require reporting under the Rule generally.  Despite raising a facial challenge, Plaintiffs apparently concede that the Rule could properly require reporting of certain real estate transfers (at least in instances where money changes hands).  So, even if the Court agrees that application of the Rule to certain intrastate transfers exceeds the government's enumerated powers, it should nonetheless sever and vacate only the portions of the Rule that result in such applications and permit the remainder of the Rule to function if possible.

For instance, even under Plaintiffs' cramped view of economic activity under the Commerce Clause, FinCEN could lawfully require reporting of the non-financed transfer of "shares in a cooperative housing corporation"—something that falls within the Rule's definition of "residential real property," *see* 87 Fed. Reg. at 70,266—because the transfer would be of corporate shares and not an actual residential building (even if such shares permit the holder the right to live in a building).  The Rule could still function sensibly even if the Court struck the remaining categories encompassed within the definition of residential real property.  *See id.* at 70,277 (remarking Rule "could continue to function sensibly" since "these categories operate independently from each other").  Because FinCEN crafted the Rule "with the intention to preserve its provisions to the fullest extent possible," *id.*, the Court should limit any remedy by severing the offending provisions rather than ordering universal vacatur.

**CONCLUSION**

The Rule falls comfortably within the federal government's enumerated powers.  The Court should therefore deny Plaintiffs' motion for summary judgment, grant Defendants' motion for summary judgment, and enter judgment in favor of Defendants.

Respectfully submitted,

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

/s/ *Saurabh Sharad*
Saurabh Sharad
Assistant United States Attorney
New York Bar No. 5363825
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Facsimile: 214-659-8807
saurabh.sharad@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

On August 12, 2025, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

/s/ *Saurabh Sharad*
Saurabh Sharad
Assistant United States Attorney